## CAMPAGNE NAVIGAZIONE SOTO Y AZNAR v. DIAMOND FUEL CO., Inc.

### CANUTE S. S. CO., Limited, v. SAME.    In re DIAMOND COAL CO.

(District Court, D. Maryland.    April 4, 1923.)

Nos. 709, 710.

Admiralty ⬤⟞50—Petitioner held estopped to intervene and allege mistake.

Petitioner, which shipped coal received as consigned to defendant, and which was sold on attachments against defendant, *held* bound by an election to treat defendant as debtor for the coal, and not entitled to intervene and claim the proceeds of the sale on the ground of mistake in the consignment.

In Admiralty. Suits by the Campagne Navigazione Soto y Aznar, a corporation of Spain and the Canute Steamship Company, Limited, against the Diamond Fuel Company, Inc. On intervening petition of the Diamond Coal Company. Petition dismissed.

Joel W. Massie and Janney, Stuart & Ober, all of Baltimore, Md., for libelants.

John A. Howard, of Wheeling, W. Va., for intervener.

W. Ainsworth Parker and Brown, Marshall, Brune & Parker, all of Baltimore, Md., for receiver.

ROSE, Circuit Judge. The libels in personam in these cases were filed more than two years ago, and upon them issued attachments which were laid in the hands of the Tidewater Coal Exchange of this port. By agreement of all then supposed to be concerned, the export contracts of the respondent were carried out, and the money, amounting to some $88,000, was received from them and paid to a trustee appointed by this court who still holds it. Decrees for still larger sums have been entered, and have been, within the last few days, affirmed by the Circuit Court of Appeals in favor of the libelants and against the respondent. In the meanwhile, and, as it is stated, within four months after the levying of the attachments, a petition in involuntary bankruptcy was filed against the respondent. Adjudication and affirmance thereof by the Circuit Court of Appeals for the Second Circuit followed (283 Fed. 108), and, certiorari having been granted (43 Sup. Ct. 89, 67 L. Ed. ——); that phase of the respondent's affairs is now before the Supreme Court.

The petition of intervention now under consideration has little relation to any of the issues thus far mentioned. It asks for the payment to the intervening petitioner of the proceeds of 40 carloads of coal which it asserts were by mistake sold by the trustee, and the net pro-

ceeds of which are now held by him. It alleges that these cars of coal were the property of the Diamond Coal Company, and not of the respondent, the Diamond Fuel Company, although by error they were listed on the books of the Tidewater Coal Exchange as belonging to the latter. The intervening petition was filed on the 12th of January 1921, but was not brought to a hearing until within the last week. According to the petitioner's theory of what happened, there was a curious comedy of errors. There are at Fairmont, W. Va., two corporations, the petitioner and the Westwood Coal Exchange. They occupy the same offices and have apparently the same stockholders and the same officers, and, as it would seem, they are each managed and directed by the same individual, one Howard W. Showalter. Within the last few days of October, 1920, as the result of some telephonic conversation, the Westwood Coal Exchange agreed to sell 66 carloads of coal to the Diamond Fuel Company. At that time no coal could be put on the cars at the mines for shipment to Tidewater for export, unless a permit had previously been obtained from the railroad company. Such permits were not issued unless the applicant for them could show that, by the time the coal got to the seaport, it would have ships ready to take it away. The facts suggest that the transaction between the Westwood Coal Exchange and the Diamond Fuel Company, with which we are now concerned, originated in the former's seeking some one who had what it had not, a permit under which coal could be shipped, and who was willing, at a price, to buy coal for that purpose.

As a result of these talks over the telephone, the Westwood, as it will be called for brevity, notified the Fuel Company that it had consigned 66 carloads of coal to it through the Tidewater Exchange at Baltimore. These notices furnished the numbers of the cars. Letters confirming what had been done were mailed from New York by the Fuel Company to the Westwood. The latter claims not to have received these confirmations, but I think that the probabilities are strong that in this it is mistaken, and that such confirmations came duly to hand. Whether they did or not, Showalter says that, after the coal had been loaded on the cars, and was on its way to the weighing station and had been entered on the Westwood's records as sold to the Fuel Company, he became a little anxious about extending so considerable a credit to that concern. He states that the coal was to be paid for as soon as the scale weights were obtained. The person who for the Fuel Company conducted the telephone negotiations testifies that payment was to be made upon delivery and presentation of the invoices. If the invoices were to be presented at the weighing station, the two versions would agree. The probabilities are that it was not definitely settled where presentation or payment was to be made for it is certain that the first 26 cars were shipped in the name of the Fuel Company, and payment for them was apparently not demanded at the time, and certainly was not made then or since.

According to Showalter's present recollection, he notified the railroad company that the last 40 carloads were shipped in the name of the Diamond Coal Company. In every other sense than that of the law, it is very possible that the Diamond Coal Company was but another name for the Westwood Coal Exchange. The natural thing for

Showalter to have done, if his purpose had been to retain title to the coal, would have been to have instructed the railroad that it was to be shipped in the name of the Westwood. Perhaps that course was not adopted because, the Westwood having no permit, the railroad company would not have taken the coal from it. On the other hand, it might well be that the railroad would not understand that there was any difference between the Diamond Fuel Company and the Diamond Coal Company, and would, as it did, carry the coal said to be shipped by the Diamond Coal Company under the permit issued to the Diamond Fuel Company. There was another difficulty, however, in shipping in the name of the Diamond Coal Company coal consigned to the Tidewater Coal Exchange. The latter would not accept shipments from any but one of its own members, which the Fuel Company was, but the Coal Company was not. Showalter says he expected to surmount this obstacle by getting payment for the coal from the Fuel Company before the cars reached Baltimore, and then letting the Fuel Company turn in the coal to the Exchange as its own, as it then would be.

That is precisely what happened, except for the important circumstance that it never was paid for, for the Fuel Company, upon receiving notices from the Westwood that the coal had been shipped in its name, consigned to the Tidewater Exchange, notified that Exchange, in accordance with the usual custom, that the 40 cars having the numbers specified, loaded with pool section 44 coal and belonging to it were rolling to the seaboard. By a curious coincidence in error, if error there was, when the coal reached its destination, the Baltimore & Ohio Railroad Company sent word to the Exchange that the coal contained in the cars in question and shipped by the Fuel Company had arrived. So far as the Tidewater Exchange was concerned, its records were complete, everything was regular, and everything showed that the coal belonged to the Fuel Company. When the attachments were laid in its hand, it had no occasion to question that the contents of these 40 cars were covered by them. It was not until a month or so after the cars had arrived that any one told it anything to the contrary. Moreover, and this is the part of the story hardest to understand, Showalter, although he was not paid for the coal, and although he knew, as he says, that the Exchange would not accept coal from the Diamond Coal Company, appears to have made no inquiries in Baltimore about the matter, until somewhere about the middle of December, when he thinks he wrote a letter of inquiry to the Tidewater Exchange. Neither the letter nor a copy of it has been produced, and the Tidewater Exchange says that it was not until about January 5 that it ever heard that anybody claimed that a mistake had been made. From his own account, Showalter does not seem to have been seriously concerned as to what had become of the coal, or where it was. If the Exchange would not take it, presumably it was lying in the cars piling up demurrage. The fact is the evidence conclusively shows that he did know what had happened to it some time before the date which he now thinks or recollects that he had written to the Coal Exchange to inquire about it.

At some time prior to December 6 he knew that the Fuel Company was in financial difficulties. He attended some creditors' conference as to its affairs. Some kind of settlement or reorganization was proposed. He says he did not agree to it, but it went far enough into details to ascertain the exact amount in securities his company would receive if the plan ever became effective, and for that amount in his attachment suit, to be presently mentioned, he gave the Fuel Company credit. It is impossible to believe that he did not by that time know what had become of the 40 cars of coal. On the 6th of December, he heard some rumor that in a bank in Grafton there was money belonging to the Fuel Company, although it was said to be on deposit in the name of its general manager, one Watson. Thereupon Showalter went to Grafton, and in the name of the Westwood brought suit against the Fuel Company and Watson, and attached Watson's bank account. In order to do so, he had to make an affidavit in which he swore that the very coal now in controversy had been sold and delivered to the Fuel Company, and had not been paid for, except in so far as he credited upon his account the value of what was to be received under the proposed creditors' agreement.

Upon his present version of what had happened and of what he then knew or supposed had happened, the only explanation or justification which can be made for the statements of this affidavit is that the Fuel Company had the coal, the Westwood did not have the money, and that he wanted, and he did not care upon what theory he got, it. Even so, it was too plain for argument that, with knowledge of what had happened, he elected to treat the coal as having been bought by the Fuel Company and delivered to it, and by that election he and those for whom he was acting must be held concluded. It was not until a month afterwards that he for the first time told either the Tidewater Exchange or the trustee that a mistake had been made, if in fact one ever was made.

It follows that the intervening petition must be dismissed, with costs.